**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**ALYSSA RHODES**,
Plaintiff,

Case No. 1:26-cv-2682
Hon.

vs.

**TRAVIS CARLSON**, individually,
Defendant.

______________________________/

Melissa Freeman (P80075)
Joshua Blanchard (P72601)
**BLANCHARD LAW**
Attorneys for Plaintiff
309 S Lafayette St., Ste 208
PO Box 938
Greenville, MI 48838
616-773-2945
melissa@blanchard.law

______________________________/

## COMPLAINT AND DEMAND FOR JURY TRIAL

**NOW COMES** Plaintiff, Alyssa Riley Rhodes, by and through counsel, and for her Complaint against Defendant Travis Carlson states as follows:

## JURISDICTION, VENUE, AND PARTIES

1. This is a civil action under 42 U.S.C. § 1983 seeking damages against Defendant for committing acts under color of law, and depriving Plaintiff of rights secured by the Constitution and laws of the United States.

2. The Court has jurisdiction of this action under 42 U.S.C. §1983 and under 28 U.S.C. §1343.

3. The jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §1331.

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the acts and omissions giving rise to these claims occurred within the Southern Division of the Western District of Michigan.

5. Plaintiff Alyssa Riley Rhodes is a citizen of the United States and the State of Michigan.

6. At all relevant times, Defendant Travis Carlson was a trooper employed by the Michigan State Police and assigned to the Lakeview Post.

7. At all relevant times, Defendant Carlson acted under color of state law and was clothed with the authority of the State of Michigan.

8. At all relevant times, Defendant Carlson acted within the course of his law-enforcement duties and used authority available to him by virtue of state law.

## COMMON ALLEGATIONS OF FACT

### Carlson's Investigation and the Identity Evidence He Learned

9. This is a wrong-person case. The Michigan State Police, through Trooper Carlson, caused Plaintiff to be charged with a serious felony sexual offense committed, if at all, by a different woman with a similar name.

10. On August 6, 2025, Defendant Carlson interviewed A.H.[1] concerning an alleged sexual assault that A.H. said occurred approximately a year earlier at the home of S.F. and J.D. in Stanton, Michigan.

11. A.H. did not identify her alleged assailant as Alyssa Riley Rhodes.

12. A.H. never supplied the middle name Riley when identifying the woman she accused.

13. When Carlson asked the suspect's name, A.H. paused to check how the woman spelled her first name and supplied a different spelling from Plaintiff's first name.

[1] The alleged victim and witnesses in the underlying criminal action are referenced by their initials out of respect for their privacy. The defendant is aware of their full names because he included them in his police report.

14. A.H. supplied only a first and last name, not Plaintiff's complete legal name.

15. A.H. told Carlson she was not positive of the woman's date of birth, but estimated that the woman was approximately 26 or 27 years old and that the woman had a daughter.

16. A.H. told Carlson she believed the woman lived in Detroit.

17. Plaintiff's description was materially different from the woman described by A.H. Plaintiff was 23 years old, lived in Luzerne in northern Michigan, had brown hair, and did not have a daughter.

18. Carlson specifically asked if A.H. knew the woman's telephone number, A.H. replied that she did not.

19. A.H. provided Carlson with a direct avenue for determining the identity of the woman she actually meant to accuse—the parties' social-media communications.

20. A.H. told Carlson that a dispute arose after the accused woman's boyfriend added A.H. on Facebook and that the woman had communicated about A.H. and the alleged incident through social media.

21. During the August 6 interview, A.H. played an online voice message for Carlson that she attributed to the woman she was accusing.

22. The online voice message was not a traditional voicemail originating from a telephone call but rather was an audio recording that was sent from one user of a social media platform to A.H.

23. The voice message purported to acknowledge sexual contact with A.H. while disputing that the contact was nonconsensual.

24. The source account, profile, device, or other identifying information associated with that message was an obvious means of determining the actual suspect that A.H. intended to accuse.

25. Carlson did not establish that the voice message originated from Plaintiff, from any account associated with or controlled by Plaintiff, or from any telephone number associated with Plaintiff.

26. There was no evidentiary connection between Plaintiff's former telephone number, 734-406-6567, and the voice message.

27. There was likewise no evidentiary connection between the 734-406-6567 number and the actual suspect.

28. Carlson knew that A.H. herself had expressly said she did not know the accused woman's telephone number.

29. In her first interview, A.H. told Carlson that the incident occurred around her birthday in September and thought the date might have been September 13.

30. Carlson nevertheless recorded in his official police report and request for arrest warrant an offense window of August 13 through August 24, 2024.

31. On September 23, 2025, in a follow up interview, A.H. expressly corrected the date events took place. She told Carlson that the incident occurred on her birthday, September 14, and stated that she had been wrong about the dates previously being used.

32. In the September follow-up interview, A.H. also described additional direct messages from the accused woman asserting that A.H. had been drunk and had wanted the sexual contact. Those communications supplied still another digital trail through which Carlson could have identified the actual sender and person that A.H. intended to accuse.

33. Carlson therefore personally knew, months before seeking a warrant, that A.H. had identified September 14 rather than an August date as the date of the alleged offense.

34. The correct date was material to any meaningful investigation of Plaintiff's whereabouts, opportunity, and alibi.

35. While conducting the initial interview of A.H., Carlson spoke on the phone to the only eyewitness—M.W.– using A.H.'s phone.

36. While A.H. was present, M.W. said that A.H. did not consent to the sexual activity.

37. On March 30, 2026, Carlson conducted a lengthy recorded follow up interview with M.W. in his patrol car.

38. M.W. described the woman she remembered as "blonde".

39. Carlson already had Plaintiff's identifying information, which described Plaintiff as brown-haired.

40. Carlson did not show M.W. a photograph of Plaintiff, conduct a photographic lineup, or otherwise ask M.W. to identify Plaintiff.

41. In the second interview, M.W. vacillated about what she witnessed, indicating that in viewing the act between A.H. and the suspect, she did not know if there was "a thing going on or what it was going on."

42. M.W. stated that she was confused about what was going on between A.H. and the other woman because she and A.H. typically went to the home to do something sexual, so she though "that's usually what goes down in this house."

43. M.W. viewed the act but was "more watching [A.H.'s] face" which appeared "shocked."

44. Carlson did not note M.W.'s equivocation about consent in his report, instead, he wrote that M.W. was "unsure why [she and A.H.] were there, as they typically only attend the residence to engage in a consensual sexual relationship with the homeowners…who were not present at the time."

45. Carlson's report referenced only M.W.'s belief that the act was not consensual.

46. Carlson also interviewed S.F., the owner of the residence where the incident allegedly occurred.

47. S.F. identified the woman she knew only as Allyssa Rhodes; she did not know Allyssa's middle name.

48. S.F. did not supply the middle name Riley.

49. When Carlson asked S.F. how the woman spelled Allyssa, S.F. supplied a spelling with two l's, different from Plaintiff's spelling, but identical to A.H.'s spelling of the actual suspect's name.

50. S.F. did not know the woman's date of birth and did not know her telephone number.

51. S.F. told Carlson that the woman had remained at the residence after S.F. and J.D. left and had been doing online live streams, providing another obvious potential source of digital identifying evidence. S.F. also told Carlson that she and J.D. returned sometime that night before midnight and learned of the alleged assault upon returning.

52. None of S.F.'s identifying information connected the accusation to Plaintiff, Alyssa Riley Rhodes.

53. Carlson prepared the Michigan State Police reports that became the factual foundation for the warrant request against Plaintiff.

54. Those reports did not fairly preserve the identity evidence Carlson personally obtained in his recorded interviews.

55. Carlson's original report falsely stated that A.H. advised she had been sexually assaulted by 'ALYSSA RILEY RHODES.'

56. That statement was false because A.H. spelled the first name differently.

57. Carlson knew this statement was false when he made it.

58. The addition of Plaintiff's middle name was false because A.H. never supplied the middle name Riley.

59. Carlson knew this statement was false when he made it.

60. Carlson omitted A.H.'s description that the woman was approximately 26 or 27 years old, had a daughter, and was believed to live in Detroit.

61. Carlson omitted that A.H. did not know the accused woman's telephone number.

62. Carlson's reports omitted A.H.'s description of additional direct messages from the actual suspect, despite the fact that those messages provided readily traceable digital source for determining the identity of the suspect.

63. Carlson's report used an August 13 through August 24, 2024 offense window even though A.H. initially told him the incident occurred around her birthday in September.

64. After A.H. expressly corrected the date to September 14 and told Carlson that she had been wrong about the earlier dates, Carlson did not correct the offense date in the investigative report package or arrest warrant request.

65. Carlson's September supplemental report omitted A.H.'s explicit correction of the date entirely.

66. Carlson omitted material identifying information supplied by S.F.—that she supplied a different spelling of the first name, did not supply the middle name Riley, and did not know the woman's telephone number.

67. Carlson listed Plaintiff's phone number in the report as the suspect's telephone number and later noted that Plaintiff had confirmed that number once belonged to her.

68. However, Carlson did not disclose in the reports that the phone number had no connection whatsoever to the voice message, no connection to A.H., and no connection to the actual suspect.

69. Because the alleged voice message was the principal piece of evidence purporting to connect the accused woman to A.H. after the incident, placing Plaintiff's telephone number into the suspect profile and later 'confirming' it without disclosing that it was unrelated to the message created a materially misleading appearance of corroboration.

70. Carlson's original report acknowledged under the heading 'IDENTIFICATION OF SUSPECT' that the suspect had been identified "verbally by ANGELA and TLO" and expressly stated, "This information will be verified upon contact with ALYSSA."

71. Carlson's wording conflated identification of the person police had located with identification of that person as the perpetrator of the alleged offense.

72. Carlson never completed a photographic lineup, in-person identification, or other procedure in which A.H., S.F., or M.W. identified Plaintiff as the woman involved in the incident.

73. At Carlson's request, Plaintiff was interviewed by a sergeant from the Michigan State Police in northern Michigan.

74. Carlson knew or should have known that the woman interviewed in northern Michigan was not Allysa Rhodes who A.H., S.F., or M.W. had described.

**Plaintiff's Interview, Corroborating Alibi, and Carlson's Warrant Request**

75. On or about April 7, 2026, at Carlson's request, Michigan State Police sergeant from the Alpena Post located Plaintiff and interviewed her in northern Michigan.

76. Plaintiff voluntarily agreed to the interview.

77. Plaintiff unequivocally stated that she did not know any of the people listed in Carlson's investigation.

78. Plaintiff unequivocally stated that she had never been to Stanton, Michigan.

79. Plaintiff denied sexually assaulting A.H. and denied sending the voice message attributed to the accused woman.

80. Plaintiff stated that she had never had sexual contact with another woman and had no idea why her name had become associated with the case.

81. Plaintiff acknowledged that 734-406-6567 had once been her telephone number and explained that she had lost that telephone in a river and later obtained a new number.

82. That acknowledgment did not connect Plaintiff to the offense because the 734 number was not connected to the voice message and was not connected to the actual suspect.

83. Plaintiff immediately supplied police with a corroborating witness and alibi: her boyfriend, Charles Lashley.

84. Police spoke with Lashley during the same encounter.

85. Lashley told police that he had been with Plaintiff every day for approximately two years, encompassing the time period in which the alleged offense could have occurred.

86. Lashley told police that Plaintiff was not in Stanton in 2024, and, to his knowledge, Plaintiff had never been to Stanton.

87. Lashley told police that he did not know any of the people named in the investigation and had not even known Stanton existed.

88. Carlson's final supplemental report recorded both Plaintiff's denials and Lashley's corroborating statements.

89. Thus, before requesting a warrant, Carlson possessed not merely Plaintiff's protest of innocence, but corroborating evidence supporting the central assertion that she had never been to the location of the alleged offense and did not know the participants.

90. Carlson did not return to the witnesses and ask whether Plaintiff was the woman they meant to accuse.

91. Carlson did not trace the voice message or social-media account to Plaintiff.

92. Carlson did not investigate the readily apparent discrepancies in name spelling, age, appearance, residence, family status, date, or digital identity.

93. Instead, on April 25, 2026, Defendant requested a warrant for Plaintiff, providing his police report and accompanying supplemental reports to the prosecutor's office to review.

94. On May 12, 2026, Michigan State Police Trooper Jacob Agema appeared before Montcalm County District Court Magistrate Dennis Magirl to supply the probable cause statement for the arrest warrant against Plaintiff.

95. Upon information and belief, Agema reviewed and relied upon Carlson's Michigan State Police reports before giving his sworn testimony.

96. Based on Carlson's report, Agema testified that "Angela [A.H.] advised that sometime around her birthday, she was sexually assaulted by Alyssa Riley Rhodes. She knew Alyssa—she knew of Alyssa, but does not consider her to be a friend."

97. Because it was excluded from the report by Carlson, Agema did not disclose that A.H. had accused "Allysa Rhodes", omitted the middle name, and did not identify Plaintiff by her complete legal name.

98. M.W.'s description of the act, A.H.'s "shocked" expression, and her belief that it was not consensual was communicated to the magistrate.

99. The magistrate did not learn that the women typically went to the home for sexual relations.

100. Agema testified about a "voice message" from Alyssa.

101. Later, in recounting the interview of Plaintiff, Agema testified as follows: "She denied sending a voicemail to Angela. She did confirm her—her phone number. She said she lost it in the river, and had to get a new one."

102. The testimony was nearly verbatim to Carlson's report.

103. The implication was that Plaintiff's old phone number had somehow been connected to the voice message.

104. In reality, there was no evidence connecting Plaintiff to the voice message.

105. The voice message was communicated through social-media accounts connected to the actual suspect, but Carlson failed to gather that evidence.

106. Because the report created the false implication, Agema did not tell the magistrate that the reports contained no connection between Plaintiff's old phone number and the voice message.

107. Lashley provided an alibi for Plaintiff for 2024, but the report indicated that Lashley spent every day with Plaintiff for two years.

108. The magistrate was not informed of the alibi.

109. Based on the materially false, misleading, and incomplete presentation, the magistrate found probable cause and an arrest warrant was issued against Plaintiff.

## The Arrest and Prosecution

110. Plaintiff was arrested pursuant to the arrest warrant after a traffic stop.

111. Plaintiff was taken to a holding cell in Mio, Michigan where she remained for 10 hours.

112. A bond was set for Plaintiff at $25,000.

113. Plaintiff had to borrow money to pay a bondsman to post the $25,000 bond.

114. A criminal prosecution commenced against Plaintiff in the 64B District Court in Montcalm County, charging Plaintiff with third-degree criminal sexual conduct.

115. Plaintiff was subjected to a $25,000 bond, compulsory criminal-court proceedings, and the continuing authority of the criminal court as a result of the charge.

116. Plaintiff lived in northern Michigan and was required to travel a substantial distance to Stanton to defend herself against a serious felony sexual offense charge.

117. Plaintiff had to miss employment to attend court appearances.

118. Plaintiff's defense attorney investigated the mistaken identity and located another woman, Allysa Anne Rhodes, who matched the identifying information developed during Carlson's investigation.

119. In a recorded interview conducted by a defense investigator, the other Allyssa acknowledged knowing A.H., acknowledged being present at the gathering, acknowledged being intoxicated, and acknowledged engaging in sexual contact with A.H. while maintaining that the contact was consensual.

120. The other Allyssa and A.H. were connected through social media in a manner consistent with the dispute and communications A.H. had described to Carlson.

121. After this information was supplied to the prosecution, the prosecutor acknowledged that the wrong person had been charged and moved to dismiss the prosecution.

122. The district court dismissed the criminal case against Plaintiff.

123. As a direct and proximate result of Defendant's conduct, Plaintiff suffered a deprivation of liberty, fear, emotional distress, humiliation, reputational injury, inconvenience, expense, and other compensable damages.

## COUNT I—
## FOURTH AMENDMENT VIOLATION
## FRANKS VIOLATION

124. Plaintiff alleges and realleges the preceding paragraphs with the same force and effect as if fully set forth herein.

125. Plaintiff's constitutionally protected rights include the right to be free from unreasonable seizure by government agents, including Defendant, as provided for by the Fourth Amendment, made actionable by 42 U.S.C. § 1983.

126. Upon information and belief, the affiant for the arrest warrant relied on Defendant's police report to provide the basis for probable cause.

127. The affiant cited to sections of the report in his swear to testimony before the magistrate.

128. Defendant, in requesting a warrant for Plaintiff's arrest, knew his police report would be relied upon in the swear to.

129. Defendant's police report omitted material information and included either intentionally or recklessly false statements which misled the issuing magistrate in finding that probable cause existed in violation of Plaintiff's Fourth Amendment rights.

130. The false and omitted information referenced above was necessary to the finding of probable cause.

131. Defendant intentionally or with reckless disregard for the truth, caused a warrant to issue by drafting a report that contained false statements and omitted material information that would have vitiated probable cause.

132. Defendant could not, in good faith, rely on a judicial determination of probable cause based on his deliberate or reckless disregard for the truth and material omissions in violation of Plaintiff's Fourth Amendment rights.

133. No warrant would have issued for the arrest of Plaintiff if Defendant had not included information they knew or should have known to be false or if Defendant had not omitted information necessary to the finding of probable cause.

134. Reasonable officers should have known these rights, and therefore, Defendant is not cloaked with qualified immunity.

135. As a direct and proximate result of Defendant's actions, Plaintiff suffered a loss of liberty, suffered humiliation, and other damages.

**WHEREFORE**, Plaintiff requests this Court enter Judgment against Defendant in whatever amount is fair, just, and equitable for the injuries and damages, compensatory and punitive, so wrongfully sustained by Plaintiff together with interests, costs, and attorney fees under 42 U.S.C. § 1988.

## COUNT II
## FOURTH AMENDMENT VIOLATION
## WARRANT LACKING PROBABLE CAUSE

136. Plaintiff alleges and realleges the preceding paragraphs with the same force and effect as if fully set forth herein.

137. Plaintiff's constitutionally protected rights include the right to be free from unreasonable seizure by government agents, including Defendant, as provided for by the Fourth Amendment, made actionable by 42 U.S.C. § 1983.

138. Defendant lacked probable cause that Plaintiff committed a crime when causing the warrant for Plaintiff's arrest to be obtained.

139. Defendant conducted the investigation and failed to obtain probable cause to arrest Plaintiff.

140. Defendant could not, in good faith, rely upon the warrant in this case because the warrant application was so lacking in indicia of probable cause as to render official belief in its existence unreasonable.

141. Reasonable officers should have known these rights, and therefore, Defendant is not cloaked with qualified immunity.

142. As a direct and proximate result of Defendant's actions, Plaintiff suffered a loss of liberty, suffered humiliation, and other damages.

**WHEREFORE**, Plaintiff requests this Court enter Judgment against Defendant in whatever amount is fair, just, and equitable for the injuries and damages, compensatory and punitive, so wrongfully sustained by Plaintiff together with interests, costs, and attorney fees under 42 U.S.C. § 1988.

## COUNT III—
## FOURTH AMENDMENT VIOLATION
## FEDERAL MALICIOUS PROSECUTION

143. Plaintiff alleges and realleges the preceding paragraphs with the same force and effect as if fully set forth herein.

144. Defendant intentionally and maliciously instituted criminal charges for Plaintiff without probable cause, by causing a warrant to issue without probable cause which contained false information and omitted relevant and material information.

145. Defendant made, influenced, or participated in the decision to prosecute without probable cause in violation of Plaintiff's Fourth Amendment rights.

146. The criminal case against Plaintiff was dismissed, resulting in termination of the charge in Plaintiff's favor.

147. Defendant acted with reckless disregard of the truth in causing a criminal proceeding to begin.

148. Plaintiff was deprived of liberty when she was arrested, jailed, and subjected to bond conditions.

149. Plaintiff was subjected to humiliation, fear, arrest, and detention against her will, criminal charges, and pain and suffering by the illegal acts of Defendant.

**WHEREFORE**, Plaintiff requests this Court enter Judgment against Defendant in whatever amount is fair, just, and equitable for the injuries and damages, compensatory and punitive, so wrongfully sustained by Plaintiff together with interests, costs, and attorney fees under 42 U.S.C. § 1988.

**COUNT IV—**
**FOURTEENTH AMENDMENT VIOLATION**
**DETENTION WITHOUT DUE PROCESS**

150. Plaintiff alleges and realleges the preceding paragraphs with the same force and effect as if fully set forth herein.

151. From the time of Plaintiff's arrest to the dismissal of the case, Defendant knew or should have known that Plaintiff was not the person who engaged in the criminal conduct associated with the warrant.

152. Defendant failed to fully investigate, and exculpatory evidence was available and known to Defendant at the time of Plaintiff's arrest and during Plaintiff's detention.

153. Defendant acted with something akin to deliberate indifference in failing to ascertain that the Plaintiff was not the person who engaged in the criminal conduct.

154. Defendant pursued the case against Plaintiff despite lacking probable cause.

155. Based upon the incorrect finding of probable cause due to Defendant's false and misleading report, Plaintiff was held in detention for a crime she did not commit.

156. Defendant's deliberate indifference resulted in a violation of Plaintiff's due process rights under the Fourteenth Amendment.

157. As a direct and proximate result of Defendant's actions, Plaintiff suffered a loss of liberty, suffered humiliation, and other damages.

**WHEREFORE**, Plaintiff requests this Court enter Judgment against Defendant in whatever amount is fair, just, and equitable for the injuries and damages, compensatory and punitive, so wrongfully sustained by Plaintiff together with interests, costs, and attorney fees under 42 U.S.C. § 1988.

**JURY DEMAND**

Plaintiff requests a jury for all issues so triable in this case.

Respectfully submitted,

Dated: September 24, 2026

/s/ Melissa Freeman
Melissa Freeman (P80075)
BLANCHARD LAW
Attorneys for Plaintiff
309 S Lafayette St., Ste 208
PO Box 938
Greenville, MI 48838
616-773-2945
melissa@blanchard.law